NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| EDWARD and LEEANNE LEE on behalf of their minor son E.L., | **Hon. Dennis M. Cavanaugh** |
| Plaintiffs, | **OPINION** |
| v. | Civil Action No. 06-CV-4634 (DMC) |
| LENAPE VALLEY REGIONAL BOARD OF EDUCATION, and DOUGLAS deMARRAIS sued in his official and personal capacity, |  |
| Defendants. |  |

DENNIS M. CAVANAUGH, U.S.D.J.:

This matter comes before the Court upon motion by Defendants, Lenape Valley Regional Board of Education ("Board") and Douglas deMarrais, Principal of Lenape Valley Regional High School ("Defendants") for summary judgment pursuant to Fed. R. Civ. P. 56(c). Pursuant to Fed. R. Civ. P. 78, no oral argument was heard. After carefully considering the submissions of the parties, and based upon the following, it is the finding of this Court that Defendants' motion for summary judgment is **granted** in part and **denied** in part.

I.   **BACKGROUND**[1]

At the age of fourteen, in the fall of his freshman year, E. L.[2] transferred from Newton High School to Lenape Valley Regional High School ("Lenape"). E.L. is bi-racial, his father is African

---

[1] The facts set-forth in this Opinion are taken from the Parties' Fed R. Civ. P. 56.1 statements and their respective papers.

[2] Any persons referred to in this Opinion who were underage at the time of the incidents herein discussed are referred to by their initials.

American and his mother is Caucasian.  Almost immediately after becoming a student at Lenape, a Caucasian student named C.C. called E.L. a "nigger" while riding the school bus.  Mrs. Lee reported the harassment to Lenape.  A short time later in December 2004, or January 2005, another student named S.C. while on the school bus called E.L. "nigger."  Plaintiffs again reported the incident.  Assistant Principal, Lori Lubieski, Lenape's disciplinarian, claims to have investigated the second incident and held a mediation session with the students.  Ms. Lubieski reported the incident to Mr. deMarrais in his role as the School's affirmative action officer.

Within a few months of the S.C. incident, a third student, V.E. called E.L. a "nigger" on the bus.  Plaintiffs reported the incident, Ms. Lubieski investigated the incident and again decided that a peer mediation was the only action necessary.  E.L. and V.E. were counseled regarding the inappropriateness and hurtfulness of using the names they called each other.  Again, Ms. Lubieski reported the incident to Mr. deMarrais.  Defendants allege that E.L. instigated or escalated this incident.

Within a few months of the V.E. harassment during a freshman basketball game, the captain of E.L.'s team P.P. called E.L. a "black piece of shit" while on the court with him.  The Lenape Basketball Coach suspended P.P. for one game and revoked his captainship.  Despite the fact that a punishment was issued, the Coach failed to follow school policy requiring that any incidents of harassment be reported to the administration and a written record be created of the investigation. Mrs. Lee did not report the incident to the administration until E.L.'s sophomore year.  At or about the same time as the P.P. incident, three female students called E.L. an "Alabama porch monkey." Ms. Lubieski claims that she did not learn about this incident until after E.L's sophomore year.  Ms. Lubieski was unable to investigate the incident because it was not timely brought to the

administration's attention. The record indicates that the 2004 school year ended without any further incidents.

When the September 2005 school year began, the harassment immediately resumed. In the first weeks of school, S.C., who the year before called E.L. a "nigger," said to E.L. something like, "you think you're 'ghetto' or 'gangster' with that hat on." E.L. and S.C. exchanged words, S.C. pushed E.L., and E.L. struck back. Ms. Lubieski interviewed S.C. and E.L. During the interview, S.C. indicated that there was nothing racial about his comment and E.L. agreed. Defendants suspended Plaintiff for fighting. Mrs. Lee complained about the incident, arguing that S.C.'s language was racially offensive, particularly when informed of the fact that S.C. had previously directed a racial epithet at E.L. Defendants did not discipline S.C. for his possibly offensive language.

Less than two weeks later, on September 20, 2005, D.Z. told E.L. while in study hall that E.L. would be "picking his cotton." E.L., despite not knowing D.Z.'s name, reported the incident to Ms. Lubieski. A week later on September 26, 2005, D.Z. called E.L. a "nigger" in study hall. Again, E.L. reported the incident to Ms. Lubieski. Defendants claim that E.L. did not report the first D.Z. incident to Ms. Lubieski until after the second comment and only after E.L. was sent out of class for using foul language. When Mrs. Lee found out about the incidents she went to the school to speak with the administration. Defendants told Mrs. Lee that D.Z. would receive an administrative detention. According to Mrs. Lee, only after she threatened to go to the media and hire a lawyer did the school decide to impose a four day suspension. Even after D.Z.'s suspension, Plaintiffs allege the harassment continued. Specifically, Plaintiffs report that D.Z. and his friends regularly threatened to beat up E.L.

In another incident, V.E., who had been involved in a prior incident with E.L. in the

preceding year repeatedly, called E.L. "nigger." Defendants claim that V.E. was only trying to stop E.L. from yelling at her younger sister on the school bus. V.E. first yelled at E.L. to leave her sister alone. Defendants allege that E.L. began to yell at V.E., telling her that he could "blow out V.E.'s and her sister's brains" and that he could have his sister "kick V.E.'s ass." Allegedly, during this incident, E.L. used several terms that are derogatory toward women. Defendants contend that V.E. "shot back with racially offensive language because it was a heated situation and she just wanted to say something that would be hurtful." Allegedly, after E.L. got off the bus he met his sister and went to V.E.'s home were he tried to confront V.E. E.L. and his sister left only after an off-duty police officer showed up and made them leave. Defendants claim that Mrs. Lee returned to V.E.'s home with her daughter and confronted V.E. to discuss the incident. Ms. Lubieski investigated the incident. Since this was V.E.'s second offense she was suspended for five days. Following the incident, V.E., E.L. and both of their mothers had a meeting to put aside their differences. At this meeting, Mrs. Lee expressed her belief that a five day suspension was too harsh. Going forward, Mr. DeMarrais made V.E. sit at the back and E.L. sit at the front of the bus.

In January 2006, J.F. called E.L. a "nigger." J.F. and E.L. were friends and J.F. allegedly used the term to refer to E.L. before, but in those instances E.L. was not bothered by the use of the term. The incident escalated and E.L spat on J.F. J.F. stood up and walked over to E.L. at which time someone called J.F.'s name. J.F. turned to see who called him and that person and E.L. hit J.F. in the face. Ms. Lubieski investigated the incident and E.L. was suspended for being an instigator and for fighting. J.F. was suspended for his racially offensive language and for fighting. Mr. deMarrais spoke to J.F. about his language and the school's zero tolerance toward racism. After this incident, E.L. and J.F. continued to be friends

4

Around this time, in a discussion between Mr. deMarrais and Plaintiffs about Lenape's response to repeated instances of racial harassment, Mr. deMarrais told Mrs. Lee he would "take the blame for last year."

As a result of the on-going racial harassment, E.L. has experienced significant distress. He started drinking frequently and smoking marijuana. He has suffered from insomnia, and reports being reduced to tears on several occasions. E.L.'s grades dropped significantly. In January 2006, E.L. enrolled in a treatment facility for substance abuse.

Sometime after the January 2006 incident, Defendants called Plaintiffs to pick E.L. up from school early because they felt E.L. needed to "cool off." When Plaintiffs arrived, they were brought into a meeting with Mr. deMarrais, Mr. Lubieski, the Child Study Team and others. Mr. deMarrais told Plaintiffs that E.L. could never return to Lenape. Defendants told Plaintiffs that they did not know what to do with E.L. Without providing the required process, Defendants informed Plaintiffs that E.L. would have to be home instructed until an out of district placement could be found. E.L. did not receive home instruction despite being out of school for at least ten days. Ultimately, E.L. was sent to Lakeland Andover, a school for children with behavioral problems. E.L. was officially placed at the Lakeland Andover School because of an Individual Education Plan ("IEP") presented to Mrs. Lee and signed by her. IEPs are created for students classified as having a disability pursuant to the Individuals with Disabilities Education Act ("IDEA"). E.L. was classified as having a disability in first grade while a student in the Newton School District. When the IEP changing E.L.'s placement was given to Mrs. Lee she was also given a pamphlet that advised her of her right to appeal the IEP and the placement of her son, but she did not appeal. Defendants claim that E.L. was not expelled and that he remained on the school roll, which is why he was able to play basketball for Lenape after he was enrolled at Lakeland Andover. Sometime during E.L.'s junior year Plaintiffs

moved to Andover, which is part of the Newton School District. E.L. enrolled in Newton High School where he completed his senior year.

The Board has a policy against harassment which sets forth specific guidelines and procedures. Plaintiffs contend that they were never given a copy of the policy nor ever told how to file a complaint. Morever, Plaintiffs contend that the students at Lenape were not informed about the policy. Specifically, they were not taught how to make a complaint, what to do if they witnessed harassment or were being harassed. Generally, Plaintiffs contend that the policy was not adhered to.

Defendants assert that Plaintiffs were aware of the harassment policy and that the students were and still are taught about the policy. Defendants assert that as a result of their urging, Plaintiffs filed a complaint with the Office of Civil Rights of the U.S. Department of Education ("OCR"). The OCR is the body that hears complaints of dissatisfaction regarding how a school handled a harassment situation.

After completing their investigation, the OCR concluded that Lenape properly handled the incidents in question. Plaintiffs did not complain, appeal, or otherwise take further action with regard to the OCR report despite being invited by the OCR to do so. Instead, Plaintiffs initiated this action.

## II.   STANDARD OF REVIEW

Summary judgment is granted only if all probative materials of record, viewed with all inferences in favor of the non-moving party, demonstrate that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. See Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986) (Brennan, J. Dissenting); Fed. R. Civ. P. 56(c). The moving party bears the burden of showing that there is no genuine issue of fact. See id. "This burden has two distinct

components: an initial burden of production, which shifts to the nonmoving party if satisfied by the moving party; and an ultimate burden of persuasion, which always remains on the moving party." Id. The non-moving party "may not rest upon the mere allegations or denials of his pleading" to satisfy this burden, but must produce sufficient evidence to support a jury verdict in his favor. Id. at 322; see also Fed. R. Civ. P. 56(e); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). "[U]nsupported allegations in [a] memorandum and pleadings are insufficient to repel summary judgment." Schoch v. First Fid. Bancorporation, 912 F.2d 654, 657 (3d Cir. 1990). "In determining whether there are any issues of material fact, the Court must resolve all doubts as to the existence of a material fact against the moving party and draw all reasonable inferences – including on issues of credibility – in favor of the nonmoving party." Newsome v. Admin. Office of the Courts of the State of N.J., 103 F. Supp. 2d 807, 815 (D.N.J. 2000), aff'd, 51 Fed. Appx. 76 (3d Cir. 2002) (citing Watts v. Univ. of Del., 622 F.2d 47, 50 (D.N.J. 1980)).

## III.   DISCUSSION

Plaintiffs seek to recover damages on the grounds that Defendants deprived E.L. of his civil rights, namely his right to have the Lenape administrators take reasonable steps in response to harassment, his right to a public education and his right to due process before being removed from a mainstream placement to an alternative placement. Plaintiffs allege that Defendants violated Title VI of the Civil Rights Act of 1864, 42 U.S.C. § 2000d ("Title VI"), the New Jersey Law Against Discrimination ("NJLAD"), the New Jersey Civil Rights Act ("NJCRA") and deprived him of his 14th Amendment rights to due process and equal protection.

### A. Plaintiffs' Title VI Claim

Defendants assert that Count one of Plaintiffs' Complaint, alleging that the Board and Mr. deMarrais violated Title VI of the Civil Rights Act of 1964 must be dismissed with prejudice because Plaintiffs fail to allege and cannot demonstrate "intentional discrimination." Plaintiffs respond by arguing that the relevant standard is deliberate indifference toward a racially hostile environment.

Title VI provides, "No person in the United States shall, on the grounds of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. There is an implied private cause of action under Title VI. See Barnes v. Gorman, 536 U.S. 181, 185-87 (2002). Title VI, however, "does not recognize individual liability." Shotz v. City of Plantation, 344 F.3d 1161, 1170 (11th Cir. 2003); see Kelly v. Rice, 375 F. Supp. 2d 203, 208 (S.D.N.Y. 2005).

Plaintiffs do not attempt to allege that Defendants acted with intent; instead they rely on the argument that Defendants acted with deliberate indifference. Although there appears to be questions of fact as to whether Defendants acted with deliberate indifference, it is well settled that Title VI "directly reaches only instances of intentional discrimination." Alexander v. Sandoval, 532 U.S. 275, 281 (2001). The Third Circuit has likewise rejected the application of the deliberate indifference standard to Title VI claims. See Pryor v. Ncaa, 288 F.3d 548, 567-68 (3d Cir. 2002).

Since the Plaintiffs have not alleged any facts to support a finding of intentional discrimination and do not contest Defendants assertion that they did not act with intent, there is no question of fact as to whether Defendants acted with intent. Therefore, summary judgment is **granted** as to Plaintiffs' Title VI claim.

**B.     Plaintiffs' Due Process Claim**

Defendants argue that Plaintiffs' due process claim should be dismissed because Mrs. Lee signed an IEP and thereby consented to E.L.'s placement change as required by N.J.A.C. § 6A:14-2.3.  Defendants also argue that Plaintiffs did not exhaust all of their administrative remedies by filing for a mediation and/or due process with the New Jersey Department of Education's Office of Special Education.  See 20 U.S.C. § 1415; N.J.A.C. § 6A:14-2.1 *et seq.*; A.W. v. Jersey City Public Schools, 486 F.3d 791, 802-03 (3d Cir. 2007).  Defendants further argue that E.L. was not expelled and that he remained a student of the district because the district paid his tuition, he played on the Lenape basketball team after his placement change and he had the option to graduate from his home district.  See N.J.S.A. § 18A:46-21; N.J.A.C. § 6A:14-4.11.  Lastly, Defendants argue that Mr. deMarrais had no involvement in the decision to change E.L.'s IEP as the decision was made by the Child Study Team and E.L.'s parents.

Plaintiffs argue that E.L. was summarily expelled from Lenape without due process in violation of the 14th Amendment.  Plaintiffs cite Goss v. Lopez for the proposition that denial of the right to attend school "for more than a trivial period" is a serious event.  See 419 U.S. 565, 576 (1975).  The number of days which constitute "more than a trivial period" can vary, however, the Goss Court declared that a "suspension [] for 10 days, is a serious event in the life of the suspended child."  Id.  Plaintiffs turn to Board Policy 5620 to demonstrate that Defendants did not give E.L. due process before removing him from Lenape.  Board Policy 5620 requires a formal hearing, including written notice of the time, place, and the charges.  During the hearing there must be an opportunity for the student/guardian to be heard, to cross-examine witnesses, to be represented by counsel and a written transcript must be kept.  Plaintiffs also argue that the fact that Lenape remained financially

responsible for E.L. does not mean that he was not expelled.

The Court avoids addressing Defendants' consent and exhaustion arguments because at issue here is not a challenge of Defendants' placement of E.L. on IDEA grounds, but rather Plaintiffs' allegation that Defendants merely used indicia of IDEA procedure to mask the true reasons why E.L.'s placement was changed. Defendants argument that they did not expel E.L. adds to the many questions of fact and law regarding Plaintiffs' due process claim. For example, it is not clear to what extent Mr. deMarrais was involved in the decision to remove E.L. from Lenape. Plaintiffs allege that Mr. deMarrais told them that E.L. was not allowed to return to Lenape. Assuming this is true, Mr. deMarrais may have played a role in E.L.'s placement change. Plaintiffs' claim also raises questions of fact and law concerning whether E.L. was expelled or suspended. It is likewise unclear whether the proper process was followed to remove E.L. from Lenape. Plaintiffs allege that the Director of Special Education confirmed Mr. deMarrais' position that E.L. would not be allowed to return to Lenape whether Plaintiffs signed an IEP or not. There is a question of fact as to whether E.L. was removed pursuant to an IEP or rather because of behavioral issues and the escalating situation at the school. Therefore, Defendants' motion for summary judgment as to Plaintiffs' due process claim is **denied**.

### C. Plaintiffs' Equal Protection Claim

Defendants assert that Plaintiffs' equal protection claim and Title VI claim are identical. Defendants evoke the Sea Clammers doctrine and argue that Plaintiffs' equal protection claim against Mr. deMarrais is preempted by their Title VI claim. See Middlesex County Sewage Auth. v. Nat's Sea Clammers Ass'n, 453 U.S. 1, 13 (1981). Sea Clammers precludes resort to 41 U.S.C. § 1983 when another federal statute provides a comprehensive remedial scheme for the same

conduct. Id. Alternatively, Defendants argue that Plaintiffs have not stated a claim under the Equal Protection Clause because they do not allege disparate treatment. Defendants further argue that "[p]roof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." Arlington Heights v. Metroploitan Hous. Dev. Corp., 429 U.S. 252, 265 (1977). Defendants claim that they investigated all complaints properly made by Plaintiffs and took whatever actions they deemed appropriate given the results of the investigation.

Plaintiffs respond to Defendants preemption argument by relying on Jones v. Indiana Area School Dist., where the Western District of Pennsylvania refused to bar an individual capacity suit brought under 42 U.S.C. § 1983. 397 F. Supp. 2d 628, 647 (W.D. Pa. 2005). The Jones Court, after noting that there is a circuit split, permitted an individual capacity suit enforcing Title IX through § 1983 despite the Sea Clammers doctrine. Plaintiffs argue that Jones controls or at least is persuasive here because Title IX mirrors Title VI.

Plaintiffs point out that the Supreme Court recently granted certiorari of a Title IX case to resolve the circuit split as to whether institutional § 1983 claims are preempted by Title IX See Fitzgerald et al. v. Barnstable School Committee, et al., Sup. Ct. Docket No, 07-125 (petition granted June 9, 2008). Based on the similarity of Title IX and Title IV, Plaintiffs argue that the Fitzgerald case will inform Title VI preemption by analogy.

Plaintiffs further argue that Defendants can be held liable for racial harassment if they are able to show, as they allege, that Defendants had a custom of violating the Equal Protection Clause. Plaintiffs support this argument by alleging that Defendants encouraged and/or condoned racial harassment by failing to take reasonable measures to stop known harassment. See eg. Amati v. United States Steel Corp., 2007 U.S. Dist. LEXIS 82079 *43 (W.D. Pa. Nov. 1, 2007) ("Harassment

11

is pervasive when incidents of harassment occur either in concert or with regularity"). An actionable custom is one in which a municipality exercises deliberate indifference to individuals' constitutional rights by ignoring a "pattern of underlying constitutional violations." Carswell v. Borough of Homestead, 381 F.3d 235, 244 (3d Cir 2004).

With respect to preemption, the Court concludes that Plaintiffs' Title VI and equal protection claims are not identical. Title VI prohibits institutions that receive government funds from discriminating. Where as the Equal Protection Clause guarantees that all covered persons will receive equal protection under the law. The Court has dismissed Plaintiffs Title VI claim because Plaintiffs did not plead that Defendants intentionally discriminated against and/or harassed E.L. Title VI was not designed to address deliberate indifference. Deliberate indifference however, can be remedied under the Equal Protection Clause. Id.

Plaintiffs have pleaded, as Defendants discussed in their brief, that Lenape was indifferent to E.L. being harassed. Plaintiffs allege the Defendants removed E.L from Lenape because they could not figure out what to do with him. Moreover, although Plaintiffs have not alleged that Defendants intentionally harassed E.L. they have alleged that Defendants ultimately decided to remove E.L. as opposed to protecting him from harassment. Plaintiffs' allegation that Defendants moved E.L. instead of remedying the harassment does raise questions of fact as to disparate treatment and equal protection. Plaintiffs' allegation of deliberate indifference to E.L.'s rights being violated raises a question of fact as to whether Defendants' conduct rises to the level of deliberate indifference. Therefore, Defendants' motion for summary judgment of Plaintiffs' equal protection claim is **denied**.

### D. Plaintiffs' 42 U.S.C. § 1983 Claim of an Official Policy, Practice or Custom

The Board argues that they are entitled to summary judgment as a matter of law because Municipal entities may be sued under § 1983 only for acts implementing an official policy, practice or custom. Monell v. Dept. of Social Servs., 436 U.S. 658, 690-91 (1978). "A plaintiff must identify the challenged policy, attribute it to the [entity] itself, and show a causal link between execution of the policy and the injury suffered." Losch v. Borough of Parkesburg, Pa., 736 F.2d 903, 910 (3d Cir. 1984). Further, "a municipality cannot be held liable under 42 U.S.C. § 1983 on a *respondeat superior* theory" of liability.

Plaintiffs assert that they have provided sufficient evidence to survive summary judgment. Plaintiffs argue that a custom of violating the Equal Protection Clause exists where the government entity failed to take reasonable measures to stop known harassment. See eg. Amati, 2007 U.S. Dist. LEXIS 82079 at *43. Plaintiffs allege that Defendants failed to take reasonable measures to stop E.L. from being harassed as evidenced by Defendants failure to follow their own policies enacted to protect against discrimination.

Defendants cannot shield themselves from liability by enacting anti-discrimination policies if they do not follow them. There is a material question of fact as to whether Defendants followed their anti-discrimination policies. There is also a question of fact as to whether Defendants were willfully indifferent to harassment of E.L. Therefore, Defendants motion for summary judgment of Plaintiffs § 1983 claim is **denied**.

### E. Plaintiffs' New Jersey Law Against Discrimination Claim

The LAD prohibits a place of public accommodation from denying any person, on the basis of his race, any of the "accommodations, advantages, facilities or privileges thereof," or from discriminating against a person on the basis of his race. N.J.S.A. 10:5-12. The New Jersey Supreme

Court has applied the hostile work environment standard to peer harassment claims.

> [A]n aggrieved student must allege discriminatory conduct that would not have occurred "but for" the student's protected characteristic, that a reasonable student of the same age, maturity level, and protected characteristic would consider sufficiently severe or pervasive enough to create an intimidating, hostile, or offensive school environment, and that the school district failed to reasonably address such conduct.

L.W. v. Toms River Regional Schools Bd. of Educ., 189 N.J. 381, 402-03 (N.J. 2007) (citing Lehmann v. Toys R Us, Inc., 132 N.J. 587, 603-04 (N.J. 1993). Furthermore, "a school district may be found liable under the LAD for student-on-student [] harassment that creates a hostile educational environment when the school district knew or should have known of the harassment, but failed to take action reasonably calculated to end the harassment." Id. at 407. "[A] district is not compelled to purge its schools of all peer harassment to avoid liability. Rather, we require school districts to implement effective preventative and remedial measures to curb severe or pervasive discriminatory mistreatment." Id.

Defendants again argue that they investigated all incidents properly reported to them and took whatever action they deemed appropriate. Defendants argue that Plaintiffs cannot establish the requisite causal link because the evidence supports that E.L. instigated several of the incidents and that the other students were simply responding in the heat of the moment. Defendants also argue that Plaintiffs cannot demonstrate unreasonableness because they believe what constitutes reasonable student discipline is outside the realm of an ordinary juror's experience and Plaintiffs have not retained an expert to testify on this issue.

Plaintiffs argue that they have raised a jury issue as to whether Defendants took effective preventative and remedial measures. The jury "must determine the reasonableness of a school district's response to peer harassment in light of the totality of the circumstances." Joyce v. City of Sea Isle City, 2008 WL 906266, at 23 (D.N.J. 2008), (citing Lehman, 132 N.J. at 551). Plaintiffs

further argue that expert testimony is not required to establish that Defendants' actions in response to harassment were unreasonable. The Toms River Court in dicta suggested that an expert may be needed. Toms River however, also provides that "[c]ommon sense will often signal the unreasonableness of inaction by a school district faced with systemic and persistent peer harassment..." Id. at 410.

Plaintiffs have raised a triable issue as to whether Defendants responded to E.L. being harassed in a reasonable manner. Furthermore, it is not evident at this time that Plaintiffs must provide expert testimony as to reasonableness. Therefore, Defendants' motion for summary judgment with respect to Plaintiffs' LAD claim is **denied**.

### F. Plaintiffs' New Jersey Civil Rights Act Claim

The NJCRA provides:

> Any person who has been deprived of any substantive due process or equal protection rights, privileges or immunities secured by the Constitution or laws of the United States, or any substantive rights, privileges or immunities secured by the Constitutions or laws of this State, or whose exercise or enjoyment of those substantive rights, privileges or immunities has been interfered with or attempted to be interfered with, by threats, intimidation or coercion by a person acting under color of law, may bring a civil action for damages and for injunctive or other appropriate relief.

N.J.S.A. 10:6-2(c). There are currently no state or federal cases interpreting this Act. Defendants turn to the Act's legislative history to suggest that interpretations of the Massachusetts and Maine Civil Rights Acts can be relied upon to provide guidance. These statutes require threats or coercion before a claim can be substantiated under them. Plaintiffs argue that NJCRA is clear on its face and that threats or coercion are not required. Plaintiffs further argue that even if the legislative history is considered, the legislative history holds that the Act is meant to provide more remedies then § 1983.

15

Given the lack of authority dealing with NJCRA and the fact that the Court has already found several triable issues regarding Plaintiffs other similar claims, the Court is not willing to dismiss this claim at this time. Additionally, Plaintiffs allegation that Defendants removed E.L. from Lenape improperly thus depriving E.L. of his right to be mainstreamed could constitute coercive activity. Therefore, there are questions of fact concerning Plaintiffs' New Jersey Civil Rights Act Claim and Defendants' motion for summary judgment is **denied**.

### G.     Qualified Immunity

Defendants seek to dismiss all causes of actions against Mr. deMarrais with prejudice because of the doctrine of qualified immunity. Under the doctrine of qualified immunity, "officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The phrase "clearly established" has been interpreted as meaning that "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987). "The qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" Hunter v. Bryant, 502 U.S. 224, 229 (1991) (quoting Malley v. Briggs, 475 U.S. 335 (1986). Nonetheless, under the Harlow test, reasonableness is measured by an objective standard, it is irrelevant that a defendant wanted to or believed he or she did handle the incident properly. Anderson, 483 U.S. at 641.

Defendants correctly point out that the issue of qualified immunity is not controlled by whether E.L. had a right to be free from racial harassment. The question rather, is whether a reasonable administrator faced with a student who is repeatedly harassed, would have known that

his or her actions in response violated the harassed student's rights. Id. at 640  Defendants argue that any reasonable administrator would have acted similar to Mr. deMarrais if faced with the same situations. Defendants again rely on the argument that every timely reported incident was investigated, students were counseled for first offenses, and when appropriate students were suspended. Defendants further argue that Mr. deMarrais over the past several years has instituted remedial programs like a Diversity School to address minority concerns within the school. Defendants assert that they have provided unrebutted expert testimony that Mr. deMarrais' actions were objectively reasonable.

Plaintiffs argue that Mr. deMarrais could not have thought that he was comporting with legal standards because he knowingly ignored Lenape's policies and regulations for dealing with peer harassment. Plaintiffs further argue that the unlawfulness of failing to respond to known acts of harassment was clear at the time that E.L. was being harassed. See Davis, 526 U.S. at 629. Additionally, Plaintiffs argue that Defendants have not provided any case law where immunity was granted to a state actor in an equal protection case.

Whether Mr. deMarrais qualifies for immunity is a triable issue because there exists questions of fact as to whether Mr. deMarrias' failure to comply with board policy rises to the level of a knowing violation of a right and whether Mr. deMarrias' failure to do more than merely respond to individual incidents with the least amount of action he deemed appropriate was reasonable. Plaintiffs' allegation that Mr. deMarrias told Mrs. Lee that E.L. could no longer attend Lenape also raises material questions of fact.

### H.   Punitive Damages

The Court agrees with Plaintiffs' position that dismissing their punitive damages claim at this stage of the litigation would be premature. Although Defendants correctly argue that punitive

17

damages are not allowed for Title VI claims, this matter is moot because the Court has dismissed Plaintiffs' Title VI claim.  See Barnes v. Gorman, 536 U.S. 181, 189 (2002).  With respect to the other claims, many of the questions of fact identified by the Court also relate to issues that would have to be addressed to demonstrate punitive damages.

**IV.    CONCLUSION**

For the reasons stated, it is the finding of the Court that Defendants' motion for summary judgment is **granted** in part and **denied** in part.  An appropriate Order accompanies this Opinion.

        S/ Dennis M. Cavanaugh
        Dennis M. Cavanaugh, U.S.D.J.

Date:       March 31, 2009
Orig.:      Clerk
cc:         All Counsel of Record
            Hon. Mark Falk, U.S.M.J.
            File